Filed 3/23/16  P. v. Castaneda CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B261363 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA133057) |
| v. | |
| JOSE LUIS CASTANEDA, | |
| Defendant and Appellant. | |

———————————

APPEAL from a judgment of the Superior Court of Los Angeles County, John T. Doyle, Judge.  Affirmed.

Paul Kleven, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Paul M. Roadarmel, Jr., Supervising Deputy Attorney General, and Stephanie A. Miyoshi, Deputy Attorney General, for Plaintiff and Respondent.

———————————

In an information, the People charged Jose Luis Castaneda (Castaneda) with two counts: (1) injuring a spouse, cohabitant, or child's parent (Pen. Code, § 273.5, subd. (a) [domestic violence][1]) and with false imprisonment by violence (§ 236).[2] Castaneda pleaded not guilty and denied the allegations. A jury subsequently found Castaneda not guilty of the domestic violence offense, but convicted him of a lesser included offense— battery (§ 243, subd. (e)(1)). The jury also convicted Castaneda of false imprisonment.

On appeal, Castaneda advances two arguments. First, he contends that the trial court erred by allowing the prosecution to introduce "propensity" evidence—evidence of uncharged prior acts of domestic violence—even though such evidence was not provided to the defense "at least 30 days prior to the trial," (§ 1054.7; Evid. Code, § 1109) but disclosed for the first time in the midst of trial. As he was purportedly denied the opportunity to investigate and prepare a defense against the uncharged domestic violence claims, Castaneda argues that the trial court's refusal to exclude such evidence was an abuse of its discretion.

Second, Castaneda argues that the trial court abused its discretion in denying his motion to dismiss (and subsequent motion for a new trial) based on prosecutorial misconduct. The alleged misconduct occurred at the outset of the trial when the People, contrary to an in limine order, mentioned in its opening statement that the victim was pregnant at the time of the charged offenses.

We disagree with both of Castaneda's arguments. Accordingly, we affirm the judgment.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] Pursuant to sections 667 and 1170.12, it was also alleged that Castaneda had a prior conviction for one serious or violent felony (violation of § 422 [criminal threats]). Appellant subsequently admitted the alleged prior conviction.

2

## BACKGROUND

On the morning of April 25, 2014, police, responding to a call, went to the home of Castaneda and Maria Ramirez (Ramirez). At that time, Castaneda and Ramirez had been in a relationship for approximately five years and they had one child together. When Ramirez opened the door to the police, she appeared to be "visibly upset, tearful, shaking," with a "puffy face" and "hesitant to talk." At that time, the police noticed and subsequently photographed red marks on Ramirez's neck which suggested bruising. The police called an ambulance; after the paramedics treated Ramirez on-site, they transported her to a hospital. The police found Castaneda in the home's garage; after 15 to 20 minutes of the police calling out to him, Castaneda unlocked the door and exited the garage; police officers then took him into custody.

On May 1, 2014, a police detective interviewed Ramirez. During the course of the interview, which was recorded, Ramirez described an earlier incident of domestic violence in 2012 involving Castaneda, which caused her to seek treatment at a hospital in Gardena and to talk to the police. The recording of the interview and the detective's written summary of the interview, which references the prior uncharged incident of domestic abuse, were duly provided to the defense prior to the preliminary hearing. [3]

### I.  The preliminary hearing

On May 14, 2014, the superior court conducted a preliminary hearing. Ramirez, the only witness at the hearing, testified that on April 25 a verbal argument between her and Castaneda quickly escalated into a physical altercation with Castaneda slapping her, pulling her hair, shoving her, and hitting her. When the altercation spilled out into the front yard, Ramirez called out to a neighbor and asked her to call the police. When asked about the bruising on her neck, Ramirez explained that Castaneda not only grabbed her

---

[3] The detective's report summarizing his interview of Ramirez contains the following statement regarding the 2012 incident:  "'Ramirez was unable to recall the number of unreported domestic violence incidents between her and Castaneda. Ramirez did report an incident to Gardena police in 2012 which she did not pursue out of fear of Castaneda.'"

by the neck during the altercation on April 25, but had also "choked [her] two days before." At the close of its direct examination, the People established that on April 25, Ramirez was pregnant with Castaneda's child. On cross-examination, Ramirez testified, among other things, that she had (a) elected to terminate the pregnancy after the altercation on April 25 and (b) been forced to go to the hospital twice as a result of Castaneda's abuse—once on April 25 and once on a prior occasion.

## II. The trial

### A. *Reference to Ramirez's pregnancy*

On September 29, 2014, during the third day of voir dire, the People sought to exclude any reference to the victim's pregnancy at the time of the charged offenses and subsequent abortion, a motion which the defense joined. The trial court granted the motion, noting that any reference to Ramirez's pregnancy would be "'prejudicial'" and that as a result, "'pregnancy stays out.'" The next day, September 30, 2014, during its opening argument, the People, briefly, and in passing, mentioned the victim's pregnancy.

On October 1, 2014, Castaneda made an oral motion to dismiss based on prosecutorial misconduct, arguing that by violating the court's preliminary order, the prosecutor had put him in a "terrible position" before the jury, making him look like a man "beating on a pregnant woman" and encouraging the jury to improperly speculate about "what happened to this child." The prosecutor explained that his reference to Ramirez's pregnancy was due to confusion over the court's order, believing that the order merely excluded any reference to the abortion, but not the pregnancy. The court denied the motion but without prejudice to Castaneda raising the issue later.

On October 2, Castaneda renewed his oral motion to dismiss for prosecutorial misconduct. The trial court denied the motion, finding that the prosecutor's mistake was not "so egregious" that a mistrial was merited and finding further that there was "no willful misconduct" by the People and "no prejudice" to the defense.

Castaneda also raised the issue of prosecutorial misconduct arising out of the pregnancy reference in two subsequent written motions. On October 6, 2014, Castaneda filed a written motion to dismiss for prosecutorial misconduct based, in part, on the

4

People's reference to Ramirez's pregnancy in its opening statement. The trial court denied that motion as well and for the same reasons as the oral motions. Following his conviction, Castaneda raised the issue again in his motion for a new trial, which the trial court denied.

### B. Admission of propensity evidence

On September 29, 2014, after jury selection had started, the prosecutor advised the court and Castaneda's counsel that he expected Ramirez to testify about prior incidents of domestic abuse. Defense counsel objected, stating that she had no police reports, 911calls, or medical records to substantiate those claims. The prosecutor argued that although there had been no formal notice under Evidence Code section 1109, the defense had been give effective and adequate notice, because the topic of prior uncharged incidents had been covered at the preliminary hearing and that the investigation reports indicated that one incident had been reported to the Gardena Police Department, although those records had not yet been located. Castaneda disagreed that the preliminary hearing testimony provided notice that the prosecution would seek to admit propensity evidence pursuant to Evidence Code section 1109.

On October 1, 2014, the court held a hearing where Ramirez testified outside the presence of the jury regarding the prior uncharged incidents of abuse. Among other things, Ramirez stated that there had been "[s]everal" instances of domestic violence before the charged offense, including a choking incident in late April 2014 just a few days before the charged offense and one incident approximately a year and half earlier, in December 2012 in which she was punched and kicked. The trial court concluded that the evidence regarding the prior uncharged incidents "appears to be admissible," noting that the prior incidents occurred within a "very cogent time frame" for Evidence Code section 1109 evidence and "pretty close in time" to the charged offenses. Castaneda's counsel declined to cross-examine Ramirez outside the jury's presence.

On October 2, 2014, the prosecutor informed the court that after the previous day's hearing, he asked the police to check "department resources" to ascertain if

anything had been missed and, as a result, of this review documents relating to the December 2012 incident had been discovered and produced to Castaneda.[4]

Castaneda moved to exclude the newly discovered evidence, arguing that the evidence was inadmissible because it had not been produced in conformance with the notice requirements of Evidence Code section 1109—that is, at least 30 days before trial—and that the prior references to the incident (the detective's interview of Ramirez and his report summarizing the interview and Ramirez's testimony at the preliminary hearing) were insufficient to constitute the notice required by Evidence Code section 1109.

Although Castaneda's counsel argued that the belatedly discovered evidence regarding the uncharged December 2012 incident put her in a "state of unpreparedness" and that it would be "difficult" under such circumstances to cross-examine a witness or conduct a "proper investigation," she did not ask for a continuance. She did not ask for a continuance, even though the court indicated that it would consider a continuance. In fact, Castaneda's counsel repeatedly indicated that she would not consider a continuance because it would interfere with her client's right to a speedy trial.

The trial court denied the motion to suppress, explaining that while the People's investigation into the prior uncharged incidents was "sloppy" and "inadequate," there was no evidence of "willfulness or bad faith." The trial court also noted that Castaneda would have a total of five days to prepare for Ramirez's testimony about the prior uncharged incidents.

On October 6, 2014, Castaneda filed a written motion to dismiss for prosecutorial misconduct based, in part, on the belated production of evidence regarding prior uncharged incidents. Finding nothing in the written motion that would be "additionally

---

[4] In addition to the documents regarding the 2012 incident, the People also produced on October 3, 2014, 10 recently discovered photographs of Ramirez in a hospital with possible bruises on her chin and arms.

6

persuasive," the trial court denied that motion as well and for the same reasons as the oral motions.

The trial court did, however, instructed the jury with CALCRIM No. 306 that "[t]he prosecutor failed to turn over the investigative report from December 15, 2012, 30 days prior to trial, as required by law" and that "[t]he prosecutor failed to turn over the photos from the December 15th, 2012, incident 30 days prior to trial, as required by law." The jury was told that "[i]n evaluating the weight and significance of that evidence, you may consider the effect, if any, of that late disclosure" and that "[i]n evaluating the weight and significance of nondisclosure, you should assume it to be favorable to the defense."

Following his conviction, Castaneda raised the admission of the prior uncharged incidents in his motion for a new trial, which the trial court denied.

## DISCUSSION

### I. There was no abuse of discretion regarding the propensity evidence

#### A. Standard of review

On appeal, we review a trial court's ruling regarding evidence of a criminal defendant's uncharged crimes for abuse of discretion. (*People v. Abilez* (2007) 41 Cal.4th 472, 500; *People v. Jennings* (2000) 81 Cal.App.4th 1301, 1313–1314.) Similarly, we "generally review a trial court's ruling on matters regarding discovery under an abuse of discretion standard. [Citation.] In particular, 'a trial court may, in the exercise of its discretion, "consider a wide range of sanctions" in response to the prosecution's violation of a discovery order.'" (*People v. Ayala* (2000) 23 Cal.4th 225, 299.)

#### B. Propensity evidence

It has long been the rule that evidence of a person's character, including "evidence of specific instances of his or her conduct," is "inadmissible when offered to prove his or her conduct on a specified occasion." (Evid. Code, § 1101, subd. (a); see *People v. Ewoldt* (1994) 7 Cal.4th 380, 392 [noting exclusion of propensity evidence "'was a part of "the early law of England"'"], superseded by statute on another ground as stated in

7

*People v. Robertson* (2012) 208 Cal.App.4th 965, 991.)  The reason for such a rule of exclusion is not because such evidence "'has no appreciable probative value, but because it has too much.'"  (*People v. Alcala* (1984) 36 Cal.3d 604, 631, italics omitted, superseded by statute on another ground as stated in *People v. Falsetta* (1999) 21 Cal.4th 903, 911.)  """'Because evidence of other crimes may be highly inflammatory, its admissibility should be scrutinized with great care.'"""  (*People v. Abilez*, *supra*, 41 Cal.4th at p. 500.)

In recent years, however, the rule against propensity evidence has been relaxed in certain circumstances.  Specifically, propensity evidence (assuming it is not inadmissible) is currently admissible in cases involving sexual offenses, domestic violence, elder abuse, or child abuse, provided that it is also admissible under Evidence Code section 352.[5] (See Evid. Code, §§ 1108, subd. (a), 1109, subds. (a)(1), (a)(2) & (a)(3).)  "These statutes are remarkable not because they allow testimony about prior misconduct, but because they allow the jury to draw propensity inferences from the prior acts."  (*People v. Johnson* (2010) 185 Cal.App.4th 520, 529.)[6]  Moreover, a jury is allowed to draw such propensity inferences based on a reduced burden of proof—the "standard for proving past conduct is by a preponderance of the evidence, not beyond a reasonable doubt."  (*People v. Hoover* (2000) 77 Cal.App.4th 1020, 1030.)

---

[5] Under section 352, a trial court may in its discretion exclude evidence "if its probative value is substantially outweighed by the probability that its admission will . . . necessitate undue consumption of time, or . . . create a substantial danger of undue prejudice," confusion of the issues, or misleading the jury.  "'The [trial] court's exercise of discretion under Evidence Code section 352 will not be disturbed on appeal unless the court clearly abused its discretion, e.g., when the prejudicial effect of the evidence clearly outweighed its probative value.'"  (*People v. Jennings*, *supra*, 81 Cal.App.4th 1314–1315.)

[6] For example, the jury in the instant case was instructed as follows:  "If you decide that the defendant committed the uncharged domestic violence, you may . . . conclude from that evidence that the defendant was disposed or inclined to commit domestic violence and, based on that decision, also conclude that the defendant was likely to commit and did commit the crimes alleged in Count 1 . . . or the lesser offenses . . . ."

8

The rationale for greater permissiveness on the use of propensity evidence in domestic abuse cases is set forth in Evidence Code section 1109's legislative history: "'The propensity inference is particularly appropriate in the area of domestic violence because on-going violence and abuse is the norm in domestic violence cases. Not only is there a great likelihood that any one battering episode is part of a larger scheme of dominance and control, that scheme usually escalates in frequency and severity. Without the propensity inference, the escalating nature of domestic violence is likewise masked, if we fail to address the very essence of domestic violence, we will continue to see cases where perpetrators of this violence will beat their intimate partners, even kill them, and go on to beat or kill the next intimate partner. Since criminal prosecution is one of the few factors which may interrupt the escalating pattern of domestic violence, we must be willing to look at that pattern during the criminal prosecution, or we will miss the opportunity to address this problem at all.'" (*People v. Johnson* (2000) 77 Cal.App.4th 410, 419, quoting Assem. Com. Rep. on Public Safety Report (Jun. 25, 1996) pp. 3–4.)

C.    *Reciprocal discovery*

The greater liberality with respect to propensity evidence has been balanced by the addition of certain enhanced procedural safeguards. If the prosecution wishes to introduce propensity evidence, it must comply with the terms of the so-called reciprocal discovery statute (§ 1054 et seq.), which was adopted pursuant to Proposition 115. Proposition 115 "was designed to 'restore balance to our criminal justice system [and] create a system in which justice is swift and fair.'" (*Woods v. Superior Court* (1994) 25 Cal.App.4th 178, 184.) "The purpose of section 1054 et seq. is to promote ascertainment of truth by liberal discovery rules which allow parties to obtain information in order to prepare their cases and reduce the chance of surprise at trial. [Citation.] Reciprocal discovery is intended to protect the public interest in a full and truthful disclosure of critical facts, to promote the People's interest in preventing a last minute defense, and to reduce the risk of judgments based on incomplete testimony." (*People v. Jackson* (1993) 15 Cal.App.4th 1197, 1201.)

9

Section 1109 of the Evidence Code accordingly provides that in an action involving domestic violence "the people shall disclose the [propensity] evidence to the defendant, including statements of witnesses or a summary of the substance of any testimony that is expected to be offered, in compliance with Section 1054.7 of the Penal Code." (Evid Code, § 1109, subd. (b).) Section 1054.7 requires that the prosecution's disclosure of propensity evidence "shall be made *at least* 30 days prior to trial." (Italics added.) Use of the phrase 'at least' connotes a bare minimum of 30 days and implies disclosure may be ordered more than 30 days before trial." (*Sandeffer v. Superior Court* (1993) 18 Cal.App.4th 672, 677.) If the propensity evidence "becomes known to, or comes into the possession of, a party within 30 days of trial, disclosure shall be made immediately . . . ." (§ 1054.7.) One well-regarded treatise on California rules of evidence, states in its "practice commentary" that "prosecutors should be sure to follow the necessary discovery procedures [for propensity evidence] *to the dot*." (Imwinkelried & Hallahan, California Evidence Code Annotated (2015 ed.) § 1109, Prac. Com. p. 323, italics added.)

> D.      *Sanctions for untimely disclosure of propensity evidence*

If the prosecution does not comply with its disclosure obligations, section 1054.5 authorizes the court to "make any order necessary to enforce the provisions of this chapter, including, but not limited to, immediate disclosure, contempt proceedings, delaying or prohibiting the testimony of a witness or the presentation of real evidence, continuance of the matter, or any other lawful order. Further, the court may advise the jury of any failure or refusal to disclose and of any untimely disclosure." (§ 1054.5, subd. (b).) Critically, the exclusion of testimony should be ordered "*only* if all other sanctions have been exhausted." (§ 1054.5, subd. (c), italics added.) We read this limit on a trial court's ability to exclude propensity evidence as an indication of the Legislature's strong judgment that evidence of prior domestic abuse should ordinarily be admissible.

Although there are no published decisions dealing directly with the People's failure to comply with the 30-day discovery obligation under Evidence Code section

1109, the issue of what is the appropriate remedy for a belated disclosure by the People has been addressed in other circumstances. For example, in *In re Jessie L.* (1982) 131 Cal.App.3d 202, two juveniles were convicted of second degree murder. On appeal, one of the defendants argued that the testimony supporting probable cause for his arrest should have been suppressed because the prosecution failed to disclose in a timely manner a corrected supplemental police report about an accomplice's statement; the supplemental report was not provided to the defense until "the day before the first day of pretrial hearings." (*Id.* at p. 210.) The Court of Appeal affirmed, holding that "the normal remedy" for a failure of discovery "is not dismissal or the suppression of evidence, but a continuance to enable the defense to meet the new evidence." (*Ibid.*) The court found particular significance in the fact the defendant not only received the supplemental report, but was offered both a continuance and ample opportunity to cross-examine the police officer about the supplemental report. (*Id.* at pp. 210–211.) In addition, there was no evidence of willful suppression or bad faith—the officer's original report excluded certain information because "he 'just screwed up, that's all.' At the time he wrote his original report he erroneously thought such information was not necessary." (*Id.* at p. 210.) Finally, the defendant's argument about how he could have prepared a better defense if only he had received the omitted information earlier was found to be "highly speculative." (*Id.* at p. 211.)

Similarly, in *People v. Valdez* (2012) 55 Cal.4th 82, our Supreme Court affirmed a trial court's order delaying and limiting disclosure of the identities of certain prosecution witnesses, in part, because the defendant declined to accept the court's offer of a continuance: "the court stated several times that it would grant defense counsel continuances during trial upon a showing that the delayed disclosure of the witnesses' identities had hampered counsel's ability to prepare for cross-examination. . . . [D]espite the court's offers, defendant's counsel made no attempt to demonstrate that further disclosure was necessary to his trial preparation and, during trial, never requested a continuance before beginning cross-examination." (*Id.* at pp. 110–111, fn. omitted.) In reaching its decision, the *Valdez* Court noted that "'[t]here is no general constitutional

11

right to discovery in a criminal case'" and that "'"the Due Process Clause has little to say regarding the amount of discovery which the parties must be afforded."'" (*Id.* at pp. 109–110, quoting *Weatherford v. Bursey* (1977) 429 U.S. 545, 559–561 [no constitutional violation for "surprise" witness where no request for a continuance].)

A continuance is not only the normal remedy in California for a belated disclosure by the prosecution, but in many other jurisdictions as well. Indeed, the failure of the defense to seek such a remedy, or to take advantage of it if offered by the trial court, has often been cited by courts as justifying the rejection of motions for an exclusionary sanction. For example, in *People v. Bobo* (Ill. App. Ct. 2007) 874 N.E.2d 297, the trial court did not abuse its discretion in refusing to exclude one of the defendant's postarrest statements as a sanction for the prosecution's disclosure of the statement on the morning of trial, because defendant rejected trial court's offer of a continuance and because the statement was immediately disclosed by the prosecution upon its discovery. (*Id.* at p. 308.)

In *State v. Royal* (Mo. 1981) 610 S.W.2d 946, the prosecution failed to timely provide the defense with statements that he had made to police. The defense was unaware of these statements until the prosecution's opening argument, even though the prosecutor had first learned of these statements four days before trial. The Missouri Supreme Court found that the trial court properly exercised its discretion in not excluding the belatedly disclosed statements because defense counsel acted in a contradictory manner. On the one hand she claimed that if she had received the statements prior to trial, "she would have prepared different questions and defense strategy." (*Id.* at p. 953.) On the other hand, she failed to "seek[] a continuance . . . so that such [a] 'strategy' could have been developed." (*Ibid.*)

In *State v. Hale* (Ohio 2008) 892 N.E.2d 864, the Supreme Court of Ohio held that the trial court properly admitted pretrial oral statements by the defendant to law enforcement officers even though written summaries of those statements were not prepared by the prosecution, as required by the discovery statutes, and even though the prosecution did not timely disclose those statements in accordance with the trial court's

12

orders. (*Id*. at p. 891.) The Supreme Court affirmed the conviction because "the record does not show prejudice. The defense was not surprised by these statements, because defense counsel had actual foreknowledge of their content. Nor did the defense request a continuance to prepare to cross-examine [the officers], 'the trial court may have properly determined that appellant was prepared to proceed despite any claim of unfair "surprise."'" (*Id*. at p. 892.)

Similarly, in *Thomas v. State* (Md. Ct. App. 2007) 919 A.2d 49, the trial court was found to have acted within its discretion by refusing to exclude a statement that the defendant made to a federal agent but which was not disclosed in accordance with the discovery rule, because the prosecution notified the defense immediately upon learning of the statement (which was a week before trial). (*Id*. at p. 58.) In reaching its decision, the court in *Thomas* declared that "[e]xclusion of evidence for a discovery violation is not a favored sanction and is one of the most drastic measures that can be imposed." (*Ibid*.) The Maryland Court of Appeal found it significant that the defendant requested "only that the trial court exclude the evidence. He was not interested in a continuance." (*Ibid*.) While the court found defendant's disdain of a continuance significant, it did not find it surprising. The court noted that defendants, when confronted with a failure by the prosecution to meet a discovery deadline "'frequently forego requesting the limited remedy [of a continuance] that would serve th[e] purposes [of the discovery statutes] because those purposes are not really what the defense hopes to achieve. The defense, opportunistically, would rather exploit the State's error and gamble for a greater windfall.'" (*Id*. at p. 60.) The *Thomas* court further noted that the defendant's bid for a windfall exclusion was based on a misreading of the discovery statutes: "'"The discovery law is not an obstacle course that will yield a defendant the windfall of exclusion every time the State fails to negotiate one of the hurdles. Its salutary purpose is

13

to prevent a defendant from being surprised.  Its intention is to give a defendant the necessary time to prepare a full and adequate defense."'" (*Ibid.*)[7]

E.     *The trial court did not abuse its discretion in admitting the propensity evidence*

Here, we agree with the trial court and Castaneda that "there was a less than stellar investigation" into the charged offenses and the possibility of other related but uncharged offenses.  However, we part ways with Castaneda on several important points.

First, when relevant evidence regarding uncharged offenses was ultimately unearthed, it was produced to Castaneda and his counsel "immediately"—that is, in accordance with Evidence Code section 1109 (& § 1054.7).  Following Ramirez's testimony outside the presence of the jury on October 1, 2014, the prosecutor asked the detective to do another search to ensure there was no police report from the 2012 incident.  The detective did a search on "a system called DCTS" and provided the search results to the prosecutor.  Upon reviewing the search results, the prosecutor noticed there was a listing of a December 15, 2012 incident that could have been the one described by Ramirez.  The prosecutor received the report regarding the December 2012 incident on the morning of October 2, 2014, and produced a copy to Castaneda's counsel that same morning before trial resumed.  Similarly, the prosecutor received the photographs from the December 2012 incident on October 3, 2014 and produced them to counsel later that same day.

---

[7] These cases are joined by a long list of others holding that a defendant's failure to request a continuance (or avail oneself of one if offered by the trial court) is a strong indication that the belatedly disclosed evidence is not unfairly prejudicial to the defendant's case.  (See, e.g., *Tester v. State* (Ark. 2000) 30 S.W.3d 99, 104; *Commonwealth v. Janard* (Mass. App. 1983) 450 N.E.2d 660, 662; *Commonwealth v. Rodgers* (Pa. 1983) 456 A.2d 1352, 1355–1356; *People v. Brown* (Ill. 1982) 436 N.E.2d 696, 702; *State v. Thacker* (N.C. App. 1980) 262 S.E.2d 305, 306; *State v. Festo* (Conn 1980) 435 A.2d 38, 44; *State v. Starks* (Ariz. 1979) 596 P.2d 366, 369; *Taylor v. State* (Fla. App. 1974) 292 So.2d 375, 376.)

Second, suppression of belatedly produced evidence regarding uncharged incidents is a last resort, available "*only* if all other sanctions have been exhausted." (§ 1054.5, subd. (c), italics added.) The statute requires exhaustion of other remedies, in part, because the Legislature has made the determination that in domestic abuse cases, as in sexual abuse and elder abuse cases, propensity evidence should ordinarily be admissible. (See *People v. Soto* (1998) 64 Cal.App.4th 966, 983–990 [discussing Evid. Code, § 1108 and parallel provisions in Fed. Rules Evid.].) Here, not all other sanctions were exhausted. In particular, Castaneda refused to even request a continuance, even though that is one of the other remedies listed in section 1054.7 and even though the trial court indicated that it would seriously consider such a request.

Third, while it is plain that People's investigation was not a model of efficiency and diligence, there was, as the trial court found, no evidence of bad faith conduct by the police or the prosecutor. A trial court's inquiry into whether the People's handling of evidence was done in good faith or bad faith is essentially a factual inquiry and, as such, the proper standard of review is substantial evidence. (See *People v. Memro* (1995) 11 Cal.4th 786, 831, overruled on a different point in *People v. Gaines* (2009) 46 Cal.4th 172, 181, fn. 2.) Substantial evidence is evidence that is "reasonable, credible, and of solid value." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.) " ' " ' " 'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.' " ' " ' " (*Ibid.*)

Here, there is no evidence that the police or the prosecutor deliberately delayed discovery of the evidence concerning the December 2012 incident until trial was underway so as to gain a tactical advantage over Castaneda and his counsel. In fact, the evidence suggests the exact opposite, that the delay was due solely to inadvertence and mistake. The uncontroverted evidence is that the investigating detective initially missed the police report regarding the December 2012 incident because the names "Maria Ramirez" and "Jose Castaneda" are common names that appear in large numbers in the detective case tracking system, making a search for them "akin to searching [for] John

15

Smith," a search that can be difficult due to slight variations in the spelling of names. Thus, at worst, the evidence shows negligence on the part of the police in not locating the documents and pictures from the December 2012 incident earlier. However, under both criminal and civil law, negligence does not constitute bad faith. (See *People v. Ochoa* (1998) 19 Cal.4th 353, 417–418 [negligent failure to preserve evidence does not violate due process]; *Chateau Chamberay Homeowners Assn. v. Associated Internat. Ins. Co.* (2001) 90 Cal.App.4th 335, 351 ["[s]loppy or negligent claims handling does not rise to the level of bad faith"].)

In sum, the trial court did not abuse its decision in admitting evidence of the prior uncharged offenses which were not disclosed at least 30 days before trial. Under the circumstances of this case, the court's decision was both reasoned and reasonable.

## II.     There was no abuse of discretion regarding the People's opening statement

"'Prosecutors play a dual role in the criminal justice system; they are advocates, but they are also administrators of justice. [Citation.] "'[I]t is their sworn duty to see that the defendant has a fair and impartial trial, and that he be not convicted except by competent and legitimate evidence. . . .'" [Citation.]' [Citation.] A prosecutor's intemperate behavior violates the federal Constitution when that behavior comprises a pattern of conduct so egregious that it infects the trial with such unfairness as to deny the defendant due process." (*People v. Williams* (2009) 170 Cal.App.4th 587, 628.) "A prosecutor commits misconduct by eliciting evidence in violation of a ruling by the trial court or by referring during opening statements or closing arguments to evidence that the trial court has determined to be inadmissible." (*Id.* at p. 629.) "'A defendant's conviction will not be reversed for prosecutorial misconduct, however, unless it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct.'" (*Id.* at pp. 628–629.)

"'"A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions."'" (*People v. Lucero* (2000) 23

Cal.4th 692, 713–714.) "Accordingly, '[w]e review a trial court's denial of a motion for mistrial for abuse of discretion.'" (*People v. Lightsey* (2012) 54 Cal.4th 668, 718.)

Here, there was prosecutorial misconduct. The prosecutor, contrary to an express and unambiguous ruling by the trial court the day before—a ruling granting the People's own motion to exclude any reference to Ramirez's pregnancy—mentioned in his opening statement that Ramirez was pregnant at the time of the charged offenses.

However, the prosecutorial misconduct was not so egregious that it infected the whole trial with unfairness. First, there was only one reference to Ramirez's pregnancy in the prosecutor's opening statement and it was a fleeting one. Second, and more critically, the prosecutor did not refer to the pregnancy ever again or attempt to elicit testimony about the pregnancy. Third, and most important, the trial court instructed the jury—*both* before and after opening statements—that the statements and argument by counsel were not evidence. "[W]e presume that the jury relied on the instructions, not the arguments, in convicting defendant." (*People v. Morales* (2001) 25 Cal.4th 34, 47.) Finally, the fact that Castaneda was convicted of only the lesser included offense of battery on the domestic violence count—a result that the trial court considered to be a "great verdict" for the defense given the evidence—indicates that the lone reference to Ramirez's pregnancy did not inflame the jury against him. In other words, when the single, brief reference to Ramirez's pregnancy is weighed against the evidence regarding the charged offenses and the prior uncharged offenses, it is not reasonably probable that a result more favorable to the defendant would have been reached without the misconduct. Accordingly, we hold that the prosecutor's fleeting and isolated reference to Ramirez's pregnancy was harmless. (*People v. Boyette* (2002) 29 Cal.4th 381, 434–435.)

In sum, the trial court did not abuse its considerable discretion with respect to either the admission of the belatedly discovered propensity evidence or the prosecutor's misstep with respect to his opening statement. "[G]iven the myriad safeguards provided to assure a fair trial, and taking into account the reality of the human fallibility of the participants, there can be no such thing as an error free, perfect trial, and . . . the Constitution does not guarantee such a trial." (*United States v. Hasting* (1983) 461 U.S.

17

499, 508–509.)  In other words, Castaneda was "entitled to a fair trial not a perfect one." (*People v. McNally* (2015) 236 Cal.App.4th 1419, 1433.)  And that is what he received, a fair trial.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED.

JOHNSON, J.

We concur:

CHANEY, Acting P. J.

LUI, J.